UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
STEVEN COOGAN,            )
      Plaintiff             )
                          )
v.                        )
                          )            **Civil Action No.**
                          )
FMR, LLC, SEAN BURKE,     )
MICHAEL LUZZO,            )
      Defendants.           )
_____  )

## COMPLAINT AND JURY DEMAND

### INTRODUCTION

The Plaintiff, Steven Coogan ("Coogan"), is a fifty-five year old man who worked for the Defendant, FMR, LLC ("Fidelity Investments" or "Fidelity"), in its internal document printing shop from 1990 until he was fired because of his age on February 12, 2013. Coogan had an excellent career for over twenty years at Fidelity. It abruptly took a turn for the worse in the spring of 2012 when Fidelity hired the Defendant, Sean Burke ("Burke").

Coogan started at Fidelity in 1990 as a pressman supervisor in Fidelity's Impressions Division. During the next two decades, his managers evaluated his performance highly, regularly increased his salary for merit, gave him awards for performance excellence, and awarded him regular bonuses. Fidelity also regularly promoted Coogan, steadily giving him more responsibility and requiring that he master new skills. In 2008, Coogan became a Senior Manager in Fidelity's Document Printing Services ("DPS") operation. He held this position and these responsibilities until Burke's hire.

Shortly after his hire, Burke asked Coogan about the ages of his direct reports. After Burke found out that the team, with one exception, was made up of older employees, he told Coogan "we need to be younger." That summer, and through the fall of 2012, Burke pressured

1

Coogan to discipline the older employees unfairly. By contrast, Burke authorized a substantial raise for the youngest member of the team, a man in his late twenties. That fall, Burke turned his age animosity towards Coogan. He belittled Coogan's age, greeting him and another older employee with "it smells like two old men in here" and laughing at them.

In the fall of 2012, right after Coogan received another award for his good performance, Burke began to remove many of his longstanding duties, falsely critique his performance, and issued him a "final written warning" without following Fidelity's performance improvement protocol. Right after issuing the final written warning, Burke hired a woman in her twenties and planned to have her take over duties Coogan had been handling. On February 12, 2013, Burke fired Coogan abruptly for reasons that are false. Burke's superior, the Defendant, Michael Luzzo ("Luzzo"), rubber stamped Burke's discriminatory decision without any independent investigation, despite having worked with, and praised, Coogan's performance. After firing Coogan, Burke assigned the new young employee with many of Coogan's former duties. Burke later hired another woman who is substantially younger than Coogan who began performing many of Coogan's former duties. Through Burke and Luzzo's actions, Fidelity discriminated against Coogan and ended his employment because of his age.

Coogan brings this complaint against the Defendants for age discrimination in violation of M.G.L. c. 151B and the Age Discrimination in Employment Act, 29 USCS § 621 *et seq.* ("ADEA"). He brings this action against Burke and Luzzo individually for violating the Massachusetts state law, M.G.L. c. 151B, that prohibits age discrimination, interference with his right to be free from discrimination, and aiding and abetting in discrimination. He seeks compensation for past and future lost wages, the value of his lost benefits, emotional distress, and attorneys' fees and costs.

**PARTIES**

1. Coogan is an individual residing at 6 Susan Road, Marlborough, Middlesex County, Massachusetts. His date of birth is February 8, 1958. At all times relevant to this complaint, Coogan worked for the Defendants and was an employee as defined by M.G.L. c. 151B and by the ADEA.

2. Fidelity Investments is a Delaware corporation with principal office at 245 Summer Street, MZ F7B, Boston, Suffolk County, Massachusetts. Fidelity is an employer as defined by M.G.L. c. 151B and the ADEA. At all relevant times to this complaint, Fidelity was an employer as defined under M.G.L. c. 151B and the ADEA with control over the terms and conditions of Coogan's employment.

3. Burke is an individual residing in Quincy, Massachusetts. He is a Senior Director in Fidelity's DPS operation. At all times relevant to this complaint, Burke was Coogan's superior as defined under M.G.L. c. 151B and the ADEA with control over the terms and conditions of Coogan's employment.

4. Luzzo is an individual residing at 12 Sharpners Pond Road, North Andover, Massachusetts. He was a Vice President and headed of the operation at Fidelity, at all relevant times to this complaint. As a Vice President and head of DPS, Luzzo was both Burke's and Coogan's superior as defined under M.G.L. c. 151B and the ADEA with control over the terms and conditions of Coogan's employment.

**BACKGROUND**

5. Coogan started at Fidelity in 1990 as a pressman supervisor in its Impressions Division. He left Fidelity briefly in 1994 and returned in 1996.

6. When he returned, it was as a copy operator in Fidelity's new Document Services operation, an in house electronic printing operation located in Marlborough, Massachusetts.

7. The Document Services operation was the predecessor of the DPS operation that exists at Fidelity today.

8. As a copy operator, Coogan operated high speed, networked digital printing devices. Coogan got hands on experience with the operation, and output, of the Kodak, Xerox and Cannon black and white and color printing machines Fidelity used. Fidelity continued to use the Xerox equipment and one of the Cannon wide format machines through the time Coogan was fired.

9. During the next decade and a half, Coogan was regularly promoted, each time receiving more responsibility. For some of his promotions, Coogan had to learn new skills. Each time he had to learn new skills, he did so successfully.

10. Over the course of his two decades at Fidelity, Coogan reported to five supervisors, including Luzzo, who rated him as meeting or exceeding performance expectations.

11. Coogan received regular merit increases in salary at each performance review cycle and was awarded bonuses during each Fidelity bonus review cycle.

12. Coogan also received many awards for performance excellence. Based on his service to clients and performance, Coogan received Wall of Fame, On the Spot, World Class, and Star awards throughout his employment at Fidelity.

13. The World Class award included an extra $750.00 in compensation.

14. Over the years, Coogan had to introduce new software tools for use at Fidelity. For example, in approximately 2003, Coogan was instrumental in the successful rollout of a web-entry order tool, Access FWP.

15. One of the hallmarks of Coogan's performance was his work for the business partners of DPS. One business unit partner called Coogan the "face" of the Marlborough operation and complimented Coogan's "commitment to excellence."

16. In 2004, Fidelity promoted Coogan again to Manager of Document Services and Corporate Distribution Services. After his 2004 promotion, Coogan managed thirteen employees, including six mailroom associates who delivered mail to 3579 employees.

17. At the time of the promotion, Fidelity recognized Coogan for his superior work in coordinating and redistributing overflow work from one site and to other sites.

18. To oversee the mailroom, Coogan had to master mail center security, mail center management, postal hazard recognition, and mail screening principles and procedures. He did so successfully.

19. Coogan also now had responsibility to recapture business the operation had lost from Fidelity internal business groups. He successfully persuaded the Proposal Services business unit in Covington Kentucky to return to using Fidelity's document services operation. The Proposal Services business unit had used outside vendors for the previous several years.

20. In 2008, Coogan was again promoted. He now oversaw the mailroom and the print operations for two regions and directed sixteen associates.

21. As part of his new duties, Coogan now worked with document services managers in Smithfield, Rhode Island, Boston, Salt Lake City, Utah, Merrimac, New Hampshire, and West Lake, Texas to establish and implement best practices across the county.

22. He now also took on company-wide leadership roles, becoming the chair of Fidelity's National Quality Committee. In that role, he led the effort to establish standards and tools for use in all facilities throughout the country.

23. In his 2008 review, Coogan was praised for being proactive in communicating issues and potential problems to senior management, for being adaptable to changing situations and for managing business partners.

24. In approximately 2009, Coogan's superior, Vince Vallace ("Vallace") moved to another position, and his position was not filled. After Vallace's move, Coogan began reporting directly to Luzzo.

25. Luzzo reviewed Coogan in 2009, 2010, 2011, and for the first half of 2012.

26. He rated Coogan as meeting or exceeding Fidelity's expectations, and rated Coogan with "outstanding"-- Fidelity's highest performance rating--on some performance metrics. He called Coogan reliable and recognized Coogan's ability to adapt to change and manage risks accordingly.

27. Luzzo tapped Coogan to be a leader in a major site consolidation of all Fidelity's document production offices in Marlborough, Merrimack New Hampshire, and Smithfield, Rhode Island into one central office in Boston.

28. Coogan role was to coordinate the relocation of each site's equipment. While coordinating this effort, Coogan had to continue all his usual duties and make the transition seamless for DPS' business partners.

6

29. The consolidation was complex and difficult. It occurred in stages over the course of approximately eighteen months. It involved coordination between multiple managers at the closing sites and the managers in Boston.

30. In 2010, Luzzo rated Coogan as "exceeds expectations" for the metrics related to the consolidation.

31. Luzzo also praised Coogan's ability to adopt changes to business processes and practices early and to do work differently to improve operational efficiency and effectiveness.

32. Luzzo also recognized Coogan's ability to maintain productive working relationships with peers, management and business partners.

33. In 2010, after the consolidation of the document services in Boston, Coogan's title changed to Senior Manager of Document Services. Coogan now had control of the print operation's strategy and responsibility to deliver on Fidelity's return on investment metrics. He no longer had responsibility for the mailroom.

34. In this position, Coogan continued to have successes. He and his team recaptured the business of the Investment Services group business unit that had previously sent its work outside Fidelity.

35. In Coogan's mid-year performance review for 2011, Luzzo continued to praise Coogan's efforts with the consolidation and rated him as "successful performance" for the first half of the year.

36. During 2011 and 2012, Coogan again led an effort to implement of a new software interface into the DPS operation. The software had two parts: the Digital Storefront, which placed the customers' orders and the Pace Information Management System, which scheduled a job.

37. The implementation was time consuming and difficult to implement. The system was redesigning the workflow, requiring coordination with the business analysts. It also involved re-entering all the data from the existing system into the new system.

38. The data re-entry was more time consuming than anticipated. Additionally, Fidelity wanted to host the software, and there were security problems that had to be resolved before Fidelity could host the software.

39. These unanticipated difficulties had nothing to do with Coogan's management of the project.

40. However, Luzzo rated Coogan as "inconsistent performance" for the year-end 2011 performance review. This first time in his career that Coogan had ever been rated less than satisfactorily. The "inconsistent performance" rating was tied to the implementation of the software.

41. Luzzo rated Coogan as meeting or surpassing performance expectations for almost every other individual metric that as not related to the software.

42. Luzzo acknowledged that Coogan's performance was "mixed" with Coogan meeting or exceeding expectations in almost every other area. Luzzo also acknowledged that the software implementation was a "stretch" assignment and that Coogan had successfully learned from the experience.

43. At the end of 2011, Coogan received a bonus of $7,900.00.

44. For the 2012 performance review year, Coogan continued to oversee the implementation of the new software. Luzzo had Coogan focus on it, and the project was completed in August, 2012.

45. At his mid-year review in 2012, Coogan's performance evaluation returned to its previous level. Luzzo rated him as having "successful performance". Luzzo also complimented Coogan on his ability to accept the critical feedback about software implementation and to respond to the feedback.

46. In June, 2012, In-Plant Graphics, a major trade publication with a readership of approximately 20,000 in-plant reproduction professionals, profiled the successful completion of the consolidation that Coogan had led and for which Luzzo had evaluated him highly. Coogan was pictured with Luzzo and Senior Director Jamie Mannion, on the cover of the June, 2012 issue.

47. Burke became Coogan's superior in approximately July, 2012. Coogan's experience at Fidelity changed markedly after Coogan began reporting to Burke.

48. From the start of his employment, Burke showed a clear preference for younger employees.

49. Soon after Burke's hire, Burke told Coogan his team was "old" and asked the ages of Coogan's direct reports.

50. The majority of Coogan's team was over forty years old and had been working with Coogan, and at Fidelity, for many years. The team performed well.

51. A high quality tenured workforce is important at Fidelity, and Coogan was rated as "exceeding expectations" for having virtually no turnover.

52. Weeks later, Burke brought up the ages of Coogan's team a second time, saying, "We need to be younger."

53. During the merit raise period in July, 2012, Coogan recommended merit increases in the salaries for his older reports. Merit raises at Fidelity are a percentage of the employee's

9

salary. Burke reduced the percentages Coogan recommended of the older team members' raises.

54. However, during the summer of 2012, out of the usual cycle, Burke gave the youngest member on the team, an operator in his late twenties, an off-cycle, $3.00 per hour raise. Such a substantial raise, out of cycle, is unusual at Fidelity.

55. Because Burke had reduced Coogan's percentage recommendation during the previous raise cycle, the youngest worker's raise was substantially larger than the raises the older workers had received.

56. The worker, who worked for Coogan for less than a year, was average at his job and did not deserve such a substantial a raise in pay.

57. While Coogan worked at Fidelity, supervisors were instructed by Human Resources to start and proceed through a formal discipline process before firing an employee.

58. During June or July, 2012, Burke repeatedly instructed Coogan to "keep an eye" on their direct reports who were all older individuals. Specifically, Burke made it clear that Coogan was to monitor their performance strictly.

59. In the fall of 2012, Burke changed the protocol for projects workflow. Rather than use an automatic function on the machine to insert tabs into a group of documents, Burke had Coogan's team manually insert the tabs.

60. Burke changed a process that had been in place for many years without much benefit.

61. Without giving the team enough time to become proficient with the new workflow, Burke directed Coogan to initiate the formal discipline process each time the older workers made a mistake inserting a new tab.

62. In the fall of 2012, Burke pressured Coogan to give verbal warnings to two older print operators who did not deserve the verbal warnings. Coogan resisted giving the unwarranted performance discipline to the older team members.

63. Instead, Coogan coached the operators on their mistakes and add his efforts into an electronic performance management tool Coaching Notes. Coaching Notes are not part of Fidelity's disciplinary process. They allow a supervisor to track efforts to assist an employee who needs improvement.

64. Burke also began to target Coogan with his age animosity that fall.

65. On half a dozen occasions, Burke belittled Coogan's age, greeting him and another older employee with "it smells like two old men in here" and laughing at them.

66. In September, 2012, Coogan was nominated for a Star Award. The nominator chose Coogan because of the "flawless execution" of customized binders.

67. In the fall of 2012, Burke began to target Coogan for unwarranted performance discipline.

68. Beginning in October, 2012, Burke removed some of Coogan's longstanding duties from him.

69. In particular, despite the praise Coogan had received in his performance reviews for his management of business partners, Burke removed his responsibility for important business partners, such as the Investment Services and Proposal Services. Although Coogan had been responsible for these tasks for many years, Burke banned Coogan from approving work done in the shop; having contact with customers or vendors; and making decisions about client projects independently.

70. On October 31, 2012, Burke began making entries about Coogan's performance into the Coaching Notes.

71. Burke's entry made false statements about Coogan's performance.

72. For example, he claimed that Coogan had not trained his team for the change in workflow to require manual insertion of tabs and claimed that they made mistakes because Coogan had not trained them properly.

73. Burke's statement was false. Coogan gave the team individualized, hands on training. He timed them on how fast they could insert the tabs and rewarded the fasted associate with a Dunkin Donut gift card. He also held weekly group training sessions and reviewed the new procedure in his individual time with each team member.

74. Burke's claim contradicted Luzzo's 2011 performance evaluation of Coogan's actions to train his direct reports and his management of the work process.

75. Burke also claimed that a business partner was dissatisfied with Coogan's performance and that Coogan had failed to understand what the business partner wanted. Burke's claim about the business partner was also false.

76. The new software required building a certain amount into the price for the cost of the project. Coogan understood exactly what business partner wanted, and he worked with the business partner to show how the cost was built in through the software. The business partner was satisfied with Coogan's handling of the project.

77. Burke also claimed that Coogan was seriously deficient in communicating important business problems to Burke. Burke's claim that Coogan was deficient in communicating to management was false.

78. The problem to which Burke referred occurred after business hours, and Coogan alerted Burke to it during a meeting that took place the next morning.

79. Burke's claim in the Coaching Notes contradicts Coogan's performance evaluations from previous years that praised his proactive communication to management and his relationships with his superiors.

80. The contradictions between Burke's complaints about Coogan in the Coaching Notes and Coogan's previous performance record show that Burke was creating a record of false performance deficiencies so that he could fire Coogan because of Coogan's age.

81. In December 2012, Burke hired a woman in her mid-twenties to take over Coogan's duties concerning the Pace Information Management system.

82. After the hire of the young woman, on December 12, 2012, Burke gave Coogan his first written warning in all his years at Fidelity.

83. Fidelity's performance improvement process required that verbal and written warnings be given to an employee before a Final Written Warning.

84. Burke did not follow Fidelity's performance improvement process before issuing the Final Written Warning to Coogan.

85. In the "final written warning," Burke claimed Coogan needed to improve his judgment, ownership and follow up, and organizational astuteness.

86. The basis of Burke's complaints about Coogan's ownership and follow up, and organizational astuteness were false and were created as a pretext for age discrimination.

87. Burke sought to create a record of false performance deficiencies so that he could fire Coogan because of Coogan's age and because he favored younger employees.

88. For example, Burke claimed Coogan allowed a project for an internal customer, the Investment Services group, to fail, but this claim is false. The project was done to the group's specifications and on schedule. The Investment Services group was pleased with the final product.

89. Another false basis for the warning was Burke penalizing Coogan for sending a test product to a business partner. Burke had no basis for penalizing Coogan. Coogan had worked with this business partner for many years. He had previously sent it, and other business partners, tests to illustrate required work changes without penalty.

90. Burke also repeated two of the false examples he had used in the October 31, 2012 notes to claim Coogan's performance was failing.

91. The written warning required bi-weekly meetings with Burke and gave Coogan until March 13, 2013 to improve.

92. After issuing the warning, Burke did not hold bi-weekly meetings with Coogan. Burke only held two of the required meetings with Coogan between the date of the warning, December 12, 2012, and the day Coogan was fired, February 12, 2013.

93. Burke did not hold the meetings to deliberately deprive Coogan of an opportunity to improve his performance. Burke deliberately deprived him of that opportunity so that he could build a false case to fire Coogan.

94. On December 31, 2012, Burke gave Coogan an overall rating of "inconsistent performance".

95. Burke's "inconsistent performance" rating of Coogan was based on the false performance deficiencies Burke had been compiling on Coogan. The rating is a pretext for age

discrimination. Burke gave Coogan this rating based on false deficiencies so that he could fire Coogan because of his age.

96. In January, 2013, the younger woman Burke hired right before issuing Coogan's written warning began working at Fidelity. Although she was hired into a technical position initially, when she started, Burke made her a senior manager, the same level as Coogan.

97. This woman lacked relevant experience with the processes and machines used at Fidelity. It is unusual at Fidelity for someone without any relevant experience to be hired into a senior management position.

98. Coogan trained her through mid-February, including on duties that he performed.

99. On February 12, 2013, Coogan, who was scheduled to have second of the bi-weekly meetings required by the written warning, came to the meeting to find Luzzo there.

100. During the meeting, Burke claimed Coogan had made "wrong choices" on three different jobs. For each job, there was no problem with the work product or dissatisfaction from the customer, making Burke's claim false.

101. Luzzo and Burke fired Coogan. Burke made the decision to fire Coogan, and Luzzo authorized Burke's decision.

102. Luzzo and Burke are agents of Fidelity and all actions they take are actions for which Fidelity is responsible.

103. At the time he was fired, Coogan still had thirty days to complete his performance improvement plan.

104. Firing Coogan before he had completed the performance improvement plan, and Burke's failure to comply with the bi-weekly meetings that were designed to help Coogan

improve his performance, show that Burke gave Coogan the written warning for false reasons and as a pretext for age discrimination.

105. Later, on the day Coogan was fired, Fidelity changed its reason for ending Coogan's employment. Burke called Coogan with a representative from Human Resources and told Coogan that he had been fired because Burke could not trust him.

106. Burke's changing the reason for firing Coogan shows that the reasons for firing Coogan were false and pretexts for age discrimination.

107. The younger woman Burke hired in December, 2012 took over Coogan' job duties after Burke fired him, including working with the new Digital Storefront tool. Employees who once reported to Coogan began to report to her.

108. After firing Coogan, Burke hired a second woman who is also younger than Coogan. She also performs duties Coogan once performed, including working face to face with business partners. Some of the employees who once reported to Coogan began to report to her.

109. The false basis for the performance discipline, including the written warning and "inconsistent performance" review rating; firing Coogan before his performance improvement period had expired; Burke's ridiculing Coogan by telling him that "smells like two old men in here;" Burke's clear animosity towards older workers; the large and unusual raise Burke gave Coogan's young direct report; and replacing Coogan with much younger employees, all show that the reasons Fidelity gave Coogan was given for being fired are pretexts. Fidelity fired Coogan because of his age.

110. After being fired, Coogan sought out the guidance of a former manager who still worked at Fidelity, Vance Vallace, for assistance with his resume. In providing Coogan

assistance, Vallace called Coogan a leader. He also advised Coogan to include his ability to be innovative, willing to take risks, collaborative, results driven, and unwilling to accept the status quo on his resume.

111. Vallace's compliments to Coogan about his skills demonstrate that the complaints about Coogan, and the basis for firing Coogan, are false.

112. Since firing Coogan, almost all the older individuals that once reported to Coogan are gone. Younger workers now perform their duties.

113. Burke's actions towards Coogan, including falsifying Coogan's performance record and firing Coogan because of his age, are separate, individual and distinct acts of age discrimination that underlie Fidelity's discrimination against Coogan.

114. Burke's actions also interfered with Coogan's right to work in an environment free from discrimination.

115. Luzzo relied on Burke's representations about Coogan to authorize and participate in Coogan's termination. Luzzo did not conduct any independent inquiry into firing Coogan.

116. Luzzo's authorizing Coogan's termination and relying on Burke's information are separate, individual and distinct acts of age discrimination that underlie Fidelity's discrimination against Coogan.

117. Luzzo's actions interfered with Coogan's right to work in an environment free from discrimination.

118. As a result of the discriminatory conduct as outlined above, Coogan has suffered damages, including emotional distress, loss of past and future wages, loss of benefits, and other damages.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

119. Pursuant to the state and federal law requirements, Coogan has exhausted his administrative filing requirements by filing charges of discrimination at the Massachusetts Commission Against Discrimination and Equal Employment Opportunity Commission.

120. On June 8, 2014, Coogan filed a notice of Withdrawal at the Massachusetts Commission Against Discrimination with respect to his charge of discrimination. The Massachusetts Commission Against Discrimination dismissed his charge for filing in court on December 29, 2014.

## COUNT I
## AGE DISCRIMINATION
### (as to all Defendants)

The Defendants' conduct, as set forth above, constitutes unlawful discrimination on the basis of age in violation of Mass. Gen. L. c. 151B.

## COUNT II
## AGE DISCRIMINATION
### (as to Fidelity)

Fidelity's conduct, as set forth above, constitutes unlawful discrimination on the basis of age in violation of 29 USCS § 623.

## COUNT III
## VIOLATION OF M.G.L. c. 151B, §4 (5) - AIDING AND ABETTING
### (as to Defendants Burke and Luzzo)

Burke and Luzzo's conduct, as set forth above, constitute aiding and abetting, in violation of M.G.L. c. 151B, §4 (5).

# COUNT IV
## Violation of M.G.L. c. 151B, §4(4A) - INTERFERENCE
### (as to Defendants Burke and Luzzo)

As set forth above, and incorporated by reference here, Burke and Luzzo's actions constitute interference with Coogan's right to be free of discrimination in her workplace, in violation of M.G.L. c. 151B, §4(4A).

WHEREFORE, Coogan requests that this Court order the Defendants to reinstate him, and award the following relief:

1. Back pay;
2. Front pay;
3. Lost benefits;
4. Emotional distress damages;
5. Punitive damages;
6. Attorney's fees and costs;
7. Doubling or tripling of damages as provided for by statute; and
8. Any other relief to which Coogan may be entitled.

## JURY DEMAND

Coogan hereby demands a trial by jury on all of his claims.

Respectfully submitted,
STEVE COOGAN,
By his attorney,

Dated: August 13, 2015

_____
Rebecca G. Pontikes, BBO # 637157
PONTIKES LAW, LLC
10 Tremont Street, 2nd Floor
Boston, MA 02108
(617) 357-1888
rpontikes@pontikeslawllc.com