UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

STEVE COOGAN,

     Plaintiff,

v.

FMR, LLC, SEAN BURKE, and
MICHAEL LUZZO

     Defendants.

No. 15-cv-13148-GAO

**REPORT AND RECOMMENDATION ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT (DKT. NO. 61)**

CABELL, U.S.M.J.

     Steve Coogan ("Coogan" or "the plaintiff") worked for Fidelity Management & Research, LLC ("Fidelity") for over 20 years before being terminated in 2013, at the age of 55. He alleges age discrimination and has brought suit against Fidelity and his former supervisors, Sean Burke ("Burke") and Michael Luzzo ("Luzzo") (collectively "the defendants") pursuant to both M.G.L. c. 151B (Counts I, III and IV) and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 (Count II). The defendants move for summary judgment. (Dkt. No. 61). The plaintiff opposes the motion. (Dkt. No. 78). After careful consideration of the record, the parties' briefs and the information adduced at a hearing on

the motion, it is respectfully recommended that the motion for summary judgment be ALLOWED.

I.    **RELEVANT FACTUAL BACKGROUND**

The plaintiff worked for Fidelity in various positions from 1989 until his termination in February 2013.  Broadly speaking, things went well for him from 1989 through 2010, but proceeded precipitously downhill from 2010 to 2013.

1. 1989 to 2010

Fidelity hired the plaintiff in 1989 to work in its Internal Document Printing Services ("DPS") section.  (Statement of Undisputed Facts In Support of Defendants' Motion for Summary Judgment ("Defendants' SUF"), at ¶ 5).  The plaintiff left Fidelity in 1994 but subsequently returned to DPS in 1995 and worked there until his termination on February 12, 2013.  (Defendants' SUF, at ¶¶ 1, 5; Coogan's Statement of Undisputed Facts ("Plaintiff's SUF"), at ¶ 1).

The plaintiff's responsibilities with DPS included "most of the enterprise printing that supports Fidelity's business units, an all-digital configuration that produces (among other things) presentations, bound booklets, brochures, flyers, name tags, training manuals and posters."  (Defendants' SUF, at ¶ 4).

In 2008, when the plaintiff was 50, Fidelity promoted him to the position of "senior manager."  (Defendants' SUF, at ¶ 10; Plaintiff's SUF, at ¶ 2, 33).  In that role, the plaintiff managed

10-20 direct reports, ensured that all print jobs were produced timely and according to customer specifications, and oversaw the mail room, quality control, and accounting for metrics and costs. (Defendants' SUF, at ¶¶ 10, 11; Plaintiff's SUF, at ¶ 34). Luzzo was the plaintiff's direct supervisor; he held bi-weekly meetings with the plaintiff, provided him with ongoing coaching, and counseled him on opportunities for performance improvement within his role as senior manager. (Defendants' SUF, at ¶¶ 12, 13).

From 2008 through 2010, the plaintiff received numerous positive performance reviews, awards, and merit-based raises. (Plaintiff's SUF, at ¶¶ 1-44). In or around 2011, though, the plaintiff began to experience difficulties.

2. <u>2011</u>

In 2011, the plaintiff was awarded for the first time a "project manager role." (Defendants' SUF, at ¶ 17; Plaintiff's SUF, at ¶ 45). Among other things, the plaintiff was responsible for overseeing the successful implementation of a new software system Fidelity had purchased. (Defendants' SUF, at ¶ 17; Plaintiff's SUF, at ¶ 50). The software system was scheduled to be implemented and launched in full within two years; during that time the plaintiff and his team were responsible for meeting various implementation-related deadlines. (Defendants' SUF, at ¶ 20; Plaintiff's SUF, at ¶ 52).

Unfortunately, the plaintiff and his team failed to meet several of these interim deadlines, which in turn set back the launch date of the software system. (Defendants' SUF, at ¶ 22; Plaintiff's SUF, at ¶ 56). Luzzo addressed these concerns with the plaintiff, and also counseled the plaintiff on training modules, proper training documentation, and timely completion of tasks. (Defendants' SUF, at ¶¶ 27, 30).

At his 2011 mid-year performance review, Luzzo indicated among other things that the plaintiff was continuing to "lea[d]" the implementation of the software system, and that the team was "optimistic" about meeting an upcoming deadline despite being "behind target dates." Luzzo also indicated that the plaintiff did not fully meet expectations on another particular project. The plaintiff disputes that this is an accurate portrayal of his performance in 2011, but admits that Luzzo was not discriminating against him based on his age, then 53. (Defendants' SUF, ¶¶ 33-34).

At his 2011 year-end review, the plaintiff received an overall performance rating of "inconsistent," and Luzzo identified several areas where the plaintiff had failed to fully meet performance benchmarks. (Defendants' SUF, at ¶¶ 35-37, 39-42). These performance benchmarks included, among others, the "implementation of the DPS operational software," the ability to communicate

effectively, and "DPS lean document processing implementation."
(Defendants' SUF, at Ex. 12B).

### 3. 2012

In 2012, the plaintiff received a poor mid-year performance review.  More particularly, the plaintiff received a performance rating of "did not fully meet expectations" in several areas, including in the areas of "improving customer experience" and "delivering process excellence."  (Defendants' SUF, at ¶ 44). Luzzo also reduced the plaintiff's DPS-related tasks because the plaintiff was continuing to struggle with timely implementation of the new software system.  Luzzo subsequently reassigned those tasks to another DPS employee.  (Defendants' SUF, at ¶¶ 45-47).

On or about May 24, 2012, Fidelity hired Burke as a "senior director."  (Defendants' SUF, at ¶ 55; Plaintiff's SUF, at ¶ 69). Burke was born in 1957 and is approximately 11 months older than the plaintiff.  (Defendants' SUF, at ¶ 59; Plaintiff's SUF, at ¶ 74).  Burke reported directly to Luzzo and supervised approximately 30 employees, including the plaintiff.  (Defendants' SUF, at ¶ 55).  As the plaintiff's supervisor, Burke was primarily responsible for evaluating the plaintiff's performance, and for providing performance related guidance and support.  (Defendants' SUF, at ¶ 84).

On October 31, 2012, Burke met with the plaintiff to discuss concerns he had with the plaintiff's performance.  (Defendants'

SUF, at ¶ 85). Burke identified a need for "drastic improvement" in several areas, including in the areas of "leadership project execution," "working well with others," and "communication." (Defendants' SUF, at ¶ 87).

According to the plaintiff, Burke, at various times during the year, made age-related remarks directly to the plaintiff or in the plaintiff's presence. First, at some point between May and October of 2012, Burke began to come into the office where Coogan and a colleague named Zarrella worked and, referring to the smell of the garbage room located in close proximity to the plaintiff's office, would say, "It smells like two old men in here." (Defendants' SUF, at ¶¶ 192-93; Plaintiff's SUF, at ¶ 87). Second, Burke at some point during the summer of 2012 told the plaintiff that he thought the plaintiff's team was "old" and asked the plaintiff about the ages of the employees who directly reported to him, and how long each had worked at Fidelity. (Defendants' SUF, at ¶ 194; Plaintiff's SUF, at ¶ 78). Upon learning the ages of the plaintiff's staff, Burke allegedly responded that "we need to be younger." (Defendants' SUF, at ¶ 194; Plaintiff's SUF, at ¶ 81). On another occasion, when Burke learned that a particular employee was thinking about leaving Fidelity, he said "we can't lose him, he's our youngest employee," and he subsequently gave the employee a "substantial off-cycle raise." (Defendants' SUF,

at ¶ 195; Plaintiff's SUF, at ¶ 88).  Burke denies having made any
of these comments.  (Defendants' SUF, at Ex. 4).

### 4. The December 2012 Final Written Warning

In or around December 2012, Burke met with the plaintiff to
discuss a recent customer complaint regarding an improperly sized
document.[1]  (Defendants' SUF, at ¶ 92).  Although the plaintiff
denied any knowledge of the matter, Burke and Luzzo issued the
plaintiff a final written warning on December 12, 2012.
(Defendants' SUF, at ¶¶ 92, 105; Plaintiff's SUF, at ¶ 110).  The
final written warning stated in part that "[Burke and the
plaintiff] have discussed [the plaintiff's] overall performance on
multiple occasions over the past three months," and the discussions
"focused on [the plaintiff's] lack of follow-through, [the
plaintiff's] inability to understand and solve complex business
problems and an unwillingness to communicate problems and issues
to [the plaintiff's] superiors."  (Defendants' SUF, at ¶ 108).
The written warning also identified several incidents of
misconduct where the plaintiff "instructed associates to ship
inferior product to show (the business partner) it was wrong."
(Defendants' SUF, at ¶ 111).

---

[1] DPS aimed to help their clients understand how to properly size and send a
PDF document. However, in the event that the client failed to do so, "it was
standard operating procedure" for DPS staff to shrink the document in order to
achieve proper sizing for printing.  (Defendants' SUF, at ¶ 90).

Burke placed the plaintiff on probation for 90 days. (Plaintiff's SUF, at ¶ 111). The plaintiff was subject to dismissal during the probationary period unless his job performance and any identified areas of concern improved. (Defendants' SUF, at ¶¶ 107, 116; Plaintiff's SUF, at ¶ 111). Burke continued to meet with the plaintiff during this time to discuss work performance issues and opportunities for improvement. (Defendants' SUF, at ¶ 127).

On December 24, 2012, the plaintiff contacted a human resources employee to express his surprise at having received a final written warning. (Defendants' SUF, at ¶ 133). During this conversation, the plaintiff did not express any belief or concerns that he was being discriminated against on the basis of his age. (Id.).

5. The December 2012 Hiring of Jiao

On December 17, 2012, Fidelity hired Jiao, a younger woman, to work alongside the plaintiff. (Defendants' SUF, at ¶ 125; Plaintiff's SUF, at ¶ 122). Jiao came to assume many of the plaintiff's areas of responsibilities: she managed his direct reports, communicated with business partners, and processed delivery. (Defendants' SUF, at ¶ 126; Plaintiff's SUF, at ¶ 108). Burke also reassigned to Jiao all of the plaintiff's duties related to the software implementation, ostensibly so the plaintiff could

return to his duties as an operational manager. (Defendants' SUF, at ¶ 126; Plaintiff's SUF, at ¶ 125).

At his 2012 year-end performance review, the plaintiff received a rating of "did not fully meet expectations" for several key benchmarks, including among other things "partner to improve the customer experience," and "deliver process excellence." (Defendants' SUF, at ¶ 134, Ex. 15; Plaintiff's SUF, at ¶ 133). These benchmarks accounted for 80% of the plaintiff's designated duties and responsibilities. (Defendants' SUF, at ¶ 134). The plaintiff's overall performance was rated as "inconsistent." (Plaintiff's SUF, at ¶ 131).

6. The Plaintiff's February 2013 Termination

On January 10, 2013, Burke issued the plaintiff a "coaching note" which identified numerous performance concerns and "two monumental errors in data approval." (Defendants' SUF, at ¶¶ 145, 146). During a meeting to discuss the coaching note, Burke reassigned many of the plaintiff's non-administrative tasks to other DPS employees, particularly those which required him to come in contact with clients. (Defendants' SUF, at ¶ 153).

Despite Burke's ongoing coaching, the plaintiff continued to commit several errors. Among them, the plaintiff failed to correct the year on a print job in one matter. In another instance, the plaintiff sent out a print job earlier than the client had requested, resulting in additional handling expenses incurred by

the client.  (Defendants' SUF, at ¶¶ 157, 159; Plaintiff's SUF, at ¶¶ 138, 141).

There is no dispute that Burke subsequently met with the plaintiff and Zarrella to discuss the mailing mistake, but the parties offer different versions of the specific details.

The plaintiff contends that he realized on January 25, 2013 that he had caused a premature mailing by inputting the wrong date. He contends that he told Zarrella of the error and left it to Zarrella as the lead on the account to do whatever he needed to do.  He contends that he informed Burke of the error the following morning.  (Plaintiff's SUF, at ¶¶ 138-146).

By contrast, the defendants contend that the plaintiff reported at the meeting that he did not know anything about the mistake but would look into it.  According to Burke, Zarrella then returned approximately 15-20 minutes after the meeting and told Burke that he and the plaintiff had lied.  Zarrella explained that the plaintiff was worried the mistake might affect his job and he therefore asked Zarrella to lie for him, or at least not say anything if asked.  Zarrella had agreed but now recognized he had made a mistake.  Burke believed Zarrella and reported the incident to Luzzo and to Employee Relations ("ER").  Zarrella subsequently confirmed to Luzzo that the plaintiff had asked him to lie. (Defendants' SUF, at ¶¶ 161-163).

There is no dispute that, following the meeting, Fidelity's ER representative (Morrissey) was informed. Fidelity takes potential termination matters seriously so Morrissey consulted with her ER colleagues and Fidelity's employment attorney prior to the termination. (Id., at ¶ 165).

On February 12, 2013, Burke and Luzzo met with the plaintiff. The three of them discussed the plaintiff's performance issues, including the job that had been incorrectly expedited, and the instruction to ship the job with the wrong date. The plaintiff gave his explanation regarding each incident. Luzzo asked the plaintiff whether he had asked anyone to lie for him to conceal his mistake. The plaintiff denied telling Zarrella to lie for him. (Id. at ¶¶ 166-168).

Luzzo asked the plaintiff for his badge and Blackberry and instructed the plaintiff to go home. The plaintiff was told he would be contacted later. Burke and Luzzo did not believe the plaintiff and conveyed their belief to Morrissey. Burke told Morrissey that he felt they needed to terminate the plaintiff because he did not trust him. The actual decision to terminate the plaintiff was made by Burke in consultation with ER and Luzzo. Later that afternoon, Burke and Morrissey called the plaintiff together and told him he was being terminated for dishonesty. The plaintiff continued to deny the conduct. (Id. at ¶¶ 171-177, 179).

At the time of his termination the plaintiff was approximately 55 years old.  (Defendants' SUF, at ¶ 1).

Subsequently, in August 2013, Fidelity hired a woman in her late twenties to fill the vacancy left by the plaintiff's termination.  (Plaintiff's SUF, at ¶¶ 163, 165).

## II.  THE COMPLAINT

The operative complaint contains four counts.

Count I charges all three defendants with age discrimination in violation of M.G.L. c. 151B.  No specific section of the statute is referenced, but the plaintiff presumably alleges a violation of Chapter 151B, § 4(1B).

Count II charges Fidelity with age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623.

Count III charges Burke and Luzzo with aiding and abetting age discrimination in violation of M.G.L. c. 151B, § 4(5).

Finally, Count IV charges Burke and Luzzo with interference with the plaintiff's right to be free from discrimination in the workplace in violation of M.G.L. c. 151B, § 4(4A).

## III. STANDARD OF REVIEW

When the Court is presented with a motion for summary judgment, it shall grant it "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The

moving party bears the initial burden of "assert[ing] the absence of a genuine issue of material fact and then support[ing] that assertion by affidavits, admissions, or other materials of evidentiary quality." *Mulvihill v. Top-Flite Golf Co.*, 335 F.3d 15, 19 (1st Cir. 2003). Once the moving party meets that burden, in order to avoid summary judgment, the opposing party must "'show that a factual dispute does exist, but summary judgment cannot be defeated by relying on improbable inferences, conclusory allegations, or rank speculation.'" *Fontanez-Nunez v. Janssen Ortho LLC*, 447 F.3d 50, 54-55 (1st Cir. 2006) (*quoting Ingram v. Brink's, Inc.*, 414 F.3d 222, 228-29 (1st Cir. 2005)). Indeed, the opposing party must "'produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue.'" *Clifford v. Barnhart*, 449 F.3d 276, 280 (1st Cir. 2006) (*quoting Triangle Trading Co. v. Robroy Indus. Inc.*, 200 F.3d 1, 2 (1st Cir. 1999)).

When determining whether summary judgment is appropriate, "a court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor." *Id.* (*citing Nicolo v. Philip Morris, Inc.*, 201 F.3d 29, 33 (1st Cir. 2000)). The Federal Rules require "the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to

that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56)). "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" *Scott v. Harris*, 550 U.S. 372, 380 (2007) (*quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586-87 (1986)) (further internal quotation marks omitted).

IV.  **ANALYSIS**

a. **Counts I and II**

As noted, Counts I and II allege age discrimination in violation of the state statute Chapter 151B and the federal ADEA, respectively.  Both chapter 151B and the ADEA prohibit employers from discriminating against employees on the basis of their age. *See e.g., Santangelo v. New York Life Ins. Co.,* 785 F.3d 65, 68 (1st Cir. 2015).  Claims of age discrimination brought under chapter 151B and the ADEA track one another closely and the conventional three-step *McDonnell Douglas* framework (commonly called the "pretext analysis") applies to cases brought pursuant to both statutes where, as here, there is no direct evidence of discrimination.[2]  *See McDonell Douglas Corp. v. Green,* 411 U.S. 792, 802-805 (1973).

_____

[2] The plaintiff purports to present direct evidence of age discrimination by pointing to several comments allegedly made by Burke reflecting

14

The first step of the *McDonnell Douglas* framework requires the plaintiff to establish a four-element prima facie case. Under both Massachusetts and federal law, the plaintiff must establish (1) that he was over the age of 40 when he was terminated; (2) that his job performance "was sufficient to meet his employer's legitimate expectations;" (3) that he suffered an adverse employment action, such as termination; and (4) that Fidelity "sought a replacement with roughly equivalent job qualifications, thus revealing a continued need for the same services and skills." *Mesnick v. General Elec. Co.*, 950 F.2d 816, 823 (1st Cir. 1991) (*citing Hebert v. Mohawk Rubber Co.*, 872 F.2d 1104, 1110 (1st Cir. 1989)). "Establishment of the prescribed prima facie case creates a presumption that the employer engaged in impermissible age discrimination." *LeBlanc v. Great American Ins. Co.*, 6 F.3d 836, 842 (1st Cir. 1993).

If the plaintiff meets his initial burden, the burden shifts to the defendants to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802. "This entails only a burden of production, not a burden of persuasion; the task of proving discrimination remains

---

"direct expressions of distaste for older employees." (Dkt. No. 81). In the court's view these alleged comments are more properly categorized as circumstantial rather than direct evidence of age discrimination. *See Olivera v. Nestle Puerto Rico, Inc.,* 922 F.2d 43, 49 (1st Cir. 1990). In any event, the plaintiff proceeds under the *McDonnell Douglas* paradigm.

the [plaintiff's] at all times." *Mesnick*, 950 F.2d at 823 (*citing Medina-Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 9 (1st Cir. 1990)). To meet its burden, a defendant "must clearly set forth, through the introduction of admissible evidence, the reason for the plaintiff's [termination]." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 255 (1981). "The defendant need not persuade the court that it was actually motivated by the proffered reasons." *Id.* at 254.

If the defendant is able to proffer a legitimate, non-discriminatory reason for the adverse employment action, the presumption of age discrimination dissipates and the burden shifts back to the plaintiff "to prove that the reason advanced by the employer for the adverse employment action constituted a mere pretext for unlawful age discrimination." *LeBlanc*, 6 F.3d at 842. "It is not enough for the plaintiff simply to cast doubt on the employer's justification for the termination of employment. The plaintiff must present a sufficient showing that a discriminatory animus motivated the action." *Biggins v. Hazen Paper Co.*, 899 F. Supp. 809, 819 (D. Mass. 1995). In assessing pretext, the court's "focus must be on the perception of the decisionmaker," that is whether the employer believed its stated reason to be credible. *Acevedo-Parrilla v. Novartis Ex-Lax, Inc.*, 696 F.3d 128, 141 (1st Cir. 2012)(*quoting Gray v. New England Tel. & Tel. Co.*, 792 F.2d 251, 265 (1st Cir. 1986)).

1. *The Plaintiff's Prima Facie Case*

Applying the foregoing considerations here, the first prima facie element is easily met because the plaintiff was at all relevant times over the age of 40. Regarding the second element, the defendants argue that the plaintiff cannot show he met performance-related expectations where he himself acknowledged subpar performance in some instances. But, the plaintiff contends that his overall performance was satisfactory and he recites in his memorandum several indicia of satisfactory or superior performance, including that he was "regularly promoted, given merit raises, and given merit bonuses over twenty-three years at Fidelity." (Dkt. No. 81, Plaintiff's Opposition, p. 15). Understanding that the initial prima facie showing is not intended to be onerous, the court finds that this second element is met. *See e.g., Sullivan v. Liberty Mut. Ins. Co.*, 444 Mass. 34, 45 (2005). The third element is met because the plaintiff was terminated on February 12, 2013, and thus suffered an adverse employment action. Finally, the fourth element is satisfied because Fidelity sought a replacement for the plaintiff's positon following his termination.[3]

---

[3] The parties disagree as to whether the plaintiff was replaced by two, significantly younger employees, Jiao and Dolinskiy. The plaintiff maintains that Burke hired Jiao, a woman in her twenties, to replace the plaintiff while he was still employed at Fidelity, even though she "had no experience managing direct reports or running a print operation." (Dkt. No. 81). The plaintiff further alleges that following his termination, Burke hired Dolinskiy, also in her twenties, and that she "oversaw [the plaintiff's] direct reports and took

2. *Defendants' Legitimate, Nondiscriminatory Reason for the Termination*

Because the plaintiff has established a prima facie case of age discrimination, the burden shifts to the defendants to "rebut the presumption of discrimination by producing evidence that the plaintiff was [terminated] . . . for a legitimate, nondiscriminatory reason." *Miner v. Connleaf, Inc.*, 989 F. Supp. 49, 52 (D. Mass. 1997). To meet its burden, the defendants "must clearly set forth, through the introduction of admissible evidence, the reason for the plaintiff's [termination]." *Burdine*, 450 U.S. at 255.

Here, the defendants have clearly identified a nondiscriminatory reason for the plaintiff's termination. They assert that he had serious performance issues and ultimately was terminated because he asked or instructed Zarrella to lie for him to conceal a mistake the plaintiff had made. In that regard, Burke and Luzzo both testified that Zarrella told them the plaintiff had asked him to lie or at least remain silent if asked about the mistake. (Defendants' SUF, at ¶ 162). There is no issue that misconduct of that sort would constitute a legitimate nondiscriminatory basis for termination. *See e.g., Soto-Feliciano*

over [the plaintiff's] former duties." (Id.). The defendants argue that Jiao did not replace the plaintiff because she worked alongside the plaintiff prior to his termination. In either event, the defendants maintain that both Jiao and Dolinskiy had "superior credentials." (Dkt. No. 62). The Court finds this dispute to be immaterial but will assume for purposes of the summary judgment only that the plaintiff was replaced by Jiao and Dolinskiy.

*v. Villa Cofresi Hotels, Inc.,* 779 F.3d 19, 24 (1st Cir. 2015)
(plaintiff's termination for misconduct was sufficient to satisfy
burden to articulate legitimate, nondiscriminatory reason); *Ortiz-
Rivera v. Astra Zeneca LP,* 363 Fed. Appx. 45, 47 (1st Cir. 2010)
(serious doubts about plaintiff's honesty constitutes a
legitimate, nondiscriminatory basis for its adverse employment
action).

    3. *The Plaintiffs' Burden to Demonstrate Pretext*

    The burden thus shifts back to the plaintiff to show by a
preponderance of the evidence that the defendants' proffered
reasons for termination are pretextual and have no reasonable
support in the evidence. *See Koster v. Trans World Airlines, Inc.,*
181 F.3d 24, 30 (1st Cir. 1999); *Wheelock College v. Massachusetts
Commission against Discrimination*, 371 Mass. 130, 138 (1976). At
this juncture, though, "state and federal law no longer parallel
each other." *Brennan v. GTE Government Systems Corp.*, 150 F.3d
21, 26 (1st Cir. 1998). Massachusetts law requires the employee
to show only pretext, whereas under First Circuit ADEA law "[t]he
plaintiff must do more than cast doubt on the employer's
justification for the challenged action." *Goldman v. First Nat.
Bank of Boston*, 985 F.2d 1113, 1117 (1st Cir. 1993); *see also
Koster,* 181 F.3d at 30. To show pretext under the ADEA, a plaintiff
must produce sufficient evidence "to show both that the employer's
proffered reason is a sham and that discriminatory animus sparked

[its] actions." *Cruz-Ramos v. Puerto Rico Sun Oil Co.*, 202 F.3d 381, 384 (1st Cir. 2000); *see also Miner*, 989 F. Supp. at 53 ("the plaintiff cannot avert summary judgment if the record is devoid of adequate direct or circumstantial evidence of discriminatory animus on the part of the employer"). By contrast, for claims brought under M.G.L. c. 151B, "a plaintiff carries his burden of persuasion with circumstantial evidence that convinces the factfinder that the [employer's] proffered explanation is not credible." *Kelley v. Airborne Freight Co.*, 140 F.3d 335, 349 (1st Cir. 1998) (*citing Wheelock College*, 371 Mass. at 130). The plaintiff cannot make this showing regardless of the standard applied.

To begin, the plaintiff does not explain why the defendants' proffered explanation for termination of employee misconduct should contrarily be seen as pretextual, i.e., he simply does not address the issue in his opposition brief. To be sure, the plaintiff denies (in his statement of facts) that he ever asked Zarrella to lie for him or to conceal his mistake if Burke asked him about it. But, as noted above, the defendants produced evidence that the plaintiff asked Zarella to lie to Burke to conceal a mistake. Against this backdrop, the plaintiff's mere denial without more is simply insufficient to show pretext. *See Ronda-Perez v. Banco Bilbao Vizcaya Argentaria – Puerto Rico*, 404 F.3d 42, 44 (1st Cir. 2005) ("Plaintiff's plea that his denials

establish triable issues of fact foreclosing summary judgment would, if accepted, spell the end of summary judgment.").

Rather, the issue the plaintiff must address is whether the defendants' explanation for terminating the plaintiff, together with any other evidence, could reasonably be seen by a jury not only to be false but to suggest an age-driven animus. *Bennett v. Saint-Gobain Corp.*, 453 F. Supp. 2d 314, 327 (D. Mass. 2006). In that regard, the plaintiff argues that discriminatory animus can be inferred from Burke's age related comments. As noted above, there was evidence that Burke allegedly would greet the plaintiff and Zarella by saying "it smells like two old men in here," and on another occasion opined that "we need to be younger," and on yet another occasion expressed concern about losing an employee because "he is our youngest employee."

Burke denies having made any such comments. But even assuming he made them, offhanded jokes or comments endorsing the notion of younger workers are not ipso facto evidence of age discrimination or a discriminatory animus. Generally, "stray comments are insufficient to meet the plaintiff's burden in [an age discrimination case]." *Thomas v. Sears, Roebuck & Co.,* 144 F.3d 31, 34 (1st Cir. 1998); *see also Torrech-Hernandez v. General Electric Co.,* 519 F.3d 41, 51-53 (1st Cir. 2008) (comments by supervisor referring to employee as a "dinosaur" not sufficient to support a finding of pretext); *Gonzalez v. El Dia, Inc.*, 304 F.3d

63, 69-70 (1st Cir. 2002) ("stray workplace remarks normally are insufficient, standing alone, to establish either pretext or the requisite discriminatory animus"; remark that employee had "old ways" insufficient to show pretext); *Mesnick*, 950 F.2d at 826 ("Words of praise for the youth . . . do not, by themselves, indicate a bias against more mature workers."); *Medina-Munoz*, 896 F.2d at 9 (comment that sales force was "getting too old" was not indicative of age discrimination); *Fontaine v. Ebtec Corp.,* 415 Mass. 309, 314 n. 7 (1993) ("isolated or ambiguous remarks tending to suggest animus based on age are insufficient, standing alone, to prove an employer's discriminatory intent").

Moreover, any consideration of Burke's statements must take into consideration that Burke, despite being the plaintiff's direct supervisor, did not have the power to unilaterally fire the plaintiff.  Rather, it was Luzzo who made the determination to take the plaintiff's badge and Blackberry and send him home, and the plaintiff concedes that Luzzo himself never engaged in any discriminatory behavior towards the plaintiff. (Defendants' SUF, at ¶¶ 33, 38, 43, 53-54).

Finally, the plaintiff argues that proof of pretext can be inferred from the "false" allegations of poor performance he received in the period leading up to his termination.  He notes that he previously received various accolades, awards, and merit bonuses throughout his tenure, and appears to argue that the fact

that he had previously been so rewarded suggests that the poorer treatment and performance evaluations he received after Burke was hired were not genuine. The court does not find this argument compelling.

For one, this argument, even if true, still does not respond to the defendants' proffered reason for his termination, namely that the plaintiff asked Zarella to lie to conceal his mistake. Moreover, whether the poor performance evaluations and warnings the plaintiff received were deserved or not misses the relevant inquiry. When assessing pretext, the court's focus "must be on the perception of the decisionmaker, that is, whether the employer believed its stated reason to be credible." *Mesnick*, 950 F.2d at 824 (*quoting Gray*, 792 F.2d at 256). "In the absence of some other proof that the decisionmaker harbored a discriminatory animus, it is not enough that his perception may have been incorrect." *Bennett v. Saint-Gobain Corp.*, 507 F.3d 23, 31 (1st Cir. 2007) (*citing Mesnick*, 950 F.2d at 825). As noted above, the defendants had a basis to harbor concerns about the plaintiff's performance. Among other things, they produced evidence of a number of incidents of subpar performance, including problems implementing Fidelity's new software system and mistakes that resulted in customer complaints. Indeed, the plaintiff in a number of instances acknowledged the mistake or deficiency at issue.

In short, notwithstanding the plaintiff's claims of pretext, there is no evidence from which a jury could decide that the actions taken against the plaintiff were not legitimate or that they were "more probably than not caused by discrimination." *Burns v. Johnson,* No. 15-1982, 2016 WL 3675157, at *6 (1st Cir. Jul. 11, 2016). Summary judgment should therefore be entered in the defendants' favor on Counts I and II.

### b. Count III

Count III alleges that "Burke's actions towards [the plaintiff], including falsifying [the plaintiff's] performance record and firing him because of his age, are separate, individual and distinct acts of age discrimination." (Dkt. No. 1, ¶ 113). The plaintiff further alleges that by authorizing and endorsing Burke's decision to terminate the plaintiff, Luzzo likewise committed "a separate, individual and distinct act of age discrimination." (Id. at ¶ 116).

M.G.L. c. 151B, § 4(5) makes it unlawful for "any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any acts forbidden under [M.G.L. c. 151B]." M.G.L. c. 151B, § 4(5). To prevail on an aiding and abetting claim the plaintiff must show: "(1) that the defendant committed a wholly individual and distinct wrong . . . separate and distinct from the claim in main; (2) that the aider or abetter shared an intent to discriminate not unlike that of the alleged

principal offender; and (3) that the aider or abetter knew of his or her supporting role in an enterprise designed to deprive [the plaintiff] of a right guaranteed him or her under M.G.L. c. 151B." *Ping Zhao v. Bay Path College*, 982 F. Supp. 2d 104, 115 (D. Mass. 2013) (*quoting Lopez v. Commonwealth*, 463 Mass. 696 (2012)).

But, because an aiding and abetting claim under section 4(5) requires proof that the aider or abetter shared an intent to discriminate not unlike that of the alleged principal offender, the claim is wholly derivative of the underlying claim of discrimination, and fails as a matter of law if the underlying claim of discrimination fails. *See Fisher v. Town of Orange*, 885 F. Supp. 2d 468, 476-77 (D. Mass. 2012) ("A claim of aiding and abetting is wholly derivative of the underlying discrimination claim, and thus cannot be maintained unless the plaintiff has also stated a claim alleging prohibited acts."); *Bennett*, 453 F. Supp. at 331 (holding that because employer was not liable for age discrimination under state law, there can be no claim for aiding and abetting). As the court has concluded that the plaintiff's principal discrimination claim lacks merit, the aiding and abetting claim necessarily fails too. *See Russell v. Cooley Dickinson Hosp., Inc.*, 437 Mass. 443, 458 n.7 (aiding and abetting claim fails where underlying discrimination claim fails).

Independently, Count III fails because the plaintiff has not shown or even alleged that Burke and Luzzo committed "a wholly

individual and distinct wrong" separate and distinct from the principal claim of age discrimination. Accordingly, Burke and Luzzo should be granted summary judgment on Count III.

### c. Count IV

Count IV alleges that Burke and Luzzo interfered with the plaintiff's right to be free from discrimination, in violation of M.G.L. c. 151B, § 4(4A). Section 4(4A) makes it unlawful for "any person to coerce, intimidate, threaten, or interfere with another person in the exercise or enjoyment of any right granted or protected by [M.G.L. c. 151B], or to coerce, intimidate, threaten or interfere with such other person for having aided or encouraged any other person in the exercise or enjoyment of any such right granted or protected by [M.G.L. c. 151B]." To prevail on a claim of interference under § 4(4A), the plaintiff must show that Burke and Luzzo "interfered with his rights in deliberate disregard of those rights," which requires a showing of "an intent to discriminate." *Furtado v. Standard Parking Corp.*, 820 F. Supp.2d 261, 278-79 (D. Mass. 2011).

Like the aiding and abetting claim at Count III, Count IV is derivative of the underlying age discrimination claim and thus fails as a matter of law where the court has concluded that there was no age discrimination. *See Araujo v. UGL Unicco-Unicco Operations*, 53 F. Supp. 3d 371, 383 (D. Mass. 2014)("In order to maintain a claim under §4(4A), the plaintiff must allege, at a

minimum, facts showing that he was subjected to discrimination.");
*McLaughlin v. City of Lowell*, 84 Mass. App. Ct. 45, 774 (2013)
("Absent actionable discriminatory conduct, there exists no basis
on which to ground a claim of interference under Chapter 151B,
§4(4A)."). Count IV also fails independently because the plaintiff
has failed to provide any evidence that Burke and Luzzo supported
the plaintiff's termination specifically because of his age. Burke
and Luzzo therefore should be granted summary judgment on Count
IV.

## V. CONCLUSION

For the foregoing reasons, it is recommended that the
Defendants' Motion for Summary Judgment (Dkt. No. 61) be GRANTED
as to all counts. The parties are hereby advised that under the
provisions of Federal Rule of Civil Procedure 72(b), any party who
objects to this recommendation must file specific written
objections thereto with the Clerk of this Court within 14 days of
the party's receipt of this Report and Recommendation. The written
objections must specifically identify the portion of the proposed
findings, recommendations, or report to which objection is made
and the basis for such objections. The parties are further advised
that the United States Court of Appeals for this Circuit has
repeatedly indicated that failure to comply with Rule 72(b) will
preclude further appellate review of the District Court's order
based on this Report and Recommendation. *See Keating v. Secretary*

*of Health and Human Servs.*, 848 F.2d 271 (1st Cir. 1988); *United States v. Emiliano Valencia-Copete*, 792 F.2d 4 (1st Cir. 1986); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603 (1st Cir. 1980).

/s/ Donald L. Cabell
DONALD L. CABELL, U.S.M.J.

DATED:  September 1, 2017